United States District Court
Northern District of Indiana

| | |
|---|---|
| RASSON ROBY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 2:07-CV-442 JVB |
| | ) |
| JOHN YOAKUM, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Rasson Roby, a *pro se* prisoner, was granted leave to proceed on a claim that John Yoakum, an attendant at Logansport State Hospital, used excessive force against him in violation of the Eighth Amendment during an incident that occurred at the hospital in December 2007. (DE 15.) The defendant moved for summary judgment. (DE 60.) The defendant sent Roby the notice required by N.D. IND. L.R. 56.1(e); more than three months have passed and Roby has not responded to the motion for summary judgment.[1] (*See* DE 62.) Accordingly, the defendant's facts are deemed to be admitted. N.D. IND. L.R. 56.1(b); *see also Outlaw v. Newkirk*, 259 F.3d 833, 836-37 (7th Cir. 2001) (applying ordinary rules governing resolution of a motion for summary judgment in case involving *pro se* prisoner plaintiff).

At all relevant times, the defendant has been employed by the Indiana Family and Social Services Administration as a special psychiatric attendant in the Isaac Ray Treatment Center at

---

[1] The defendant's motion was filed on April 22, 2010. (DE 60.) Upon his request, Roby was granted an extension until June 24, 2010, to respond to the motion. (DE 64.) Since that date, Roby has sent various correspondence to the Court discussing unrelated matters, but he has not filed a response to the summary judgment motion. (*See* DE 68, 69, 70.) Buried within a letter to Magistrate Judge Rodovich sent in late May 2010, Roby makes the statement that he would like an opportunity to "prove John Yoakum guilty beyond [a] reasonable doubt." (DE 69.) He does not specifically respond to the arguments in the defendant's motion for summary judgment, however, nor does he specifically request additional time to do so. Given that Roby has now had more than three months to respond to the motion, the Court declines to further delay a ruling.

Logansport State Hospital. (DE 61-1, Yoakum Decl. ¶ 2.) As a special psychiatric attendant, the defendant's primary duties include providing direct patient care and protecting patients from harming themselves, other patients, and staff. (*Id.* ¶ 3.) The defendant receives annual training, including training in "therapeutic intervention," in which staff attain physical control over a misbehaving, violent, or dangerous patient in a way that does not inflict pain on the patient. (*Id.* ¶ 4.) The defendant has no formal medical training. (*Id.* ¶ 5.)

The Isaac Ray Treatment Center is the maximum security section of the Logansport State Hospital. (*Id.* ¶ 6.) In December 2007, Roby was being housed in the center's 3 West Unit, which is designated for individuals who have been deemed incompetent to stand trial. (*Id.* ¶ 7.) At that time, the defendant knew from his own experience that it was common for patients housed in the 3 West Unit to have severe psychological problems that might cause them to attempt to harm themselves, other patients, or staff. (*Id.* ¶ 8.) A number of security measures were in place in the 3 West Unit which were designed to maintain the safety of individuals in the unit. (*Id.* ¶ 9.) At 3:00 p.m. each day, there was a shift change in the unit. (*Id.* ¶ 10.) At each shift change, all patients were required to exit their rooms and go to the unit's day room where staff would do a headcount. (*Id.* ¶ 11.) In the days leading up to December 1, 2007, the defendant had been working in the 3 West Unit and had become familiar with Roby's behavior. (*Id.* ¶ 12.) He was aware that Roby had consistently refused to cooperate with hospital staff. (*Id.*)

On December 1, 2007, the defendant was not assigned to the 3 West Unit where he regularly worked, but was instead assigned to the 2 West Unit, which is adjacent to the 3 West Unit. (*Id.* ¶ 13.) At about 3:00 p.m. on that date, the normal time for shift change in the 3 West Unit, the defendant received a phone call from Jennifer Walker, a special psychological

attendant who was working in the 3 West Unit. (*Id.* ¶ 14.) There were no male attendants working in the 3 West Unit at that time, and Walker told the defendant that she needed a male to assist her with Roby. (*Id.*) The mere fact that Walker had called to request his assistance indicated to the defendant that Roby was not cooperating with Walker. (*Id.*) During their phone call, Walker informed the defendant that Roby had refused to get out of bed and exit his room to be escorted to the day room for a head count. (*Id.* ¶ 15.) After speaking with Walker, the defendant requested additional assistance from another male attendant, John Langley, and the two proceeded to Roby's room. (*Id.* ¶ 16.) At some point during this period, the defendant recalls learning that Roby was lying in bed under his sheets and had told Walker that he was naked in an effort to obstruct or stall her efforts to escort him to the day room. (*Id.* ¶ 17.) However, Roby was actually fully clothed during this incident. (*Id.*)

Once in Roby's room, the defendant and Langley found Roby lying on his bed. (*Id.* ¶ 18.) Walker issued two directives to Roby to get out of bed and go to the day room. Both times Roby did nothing. (*Id.* ¶ 19.) Walker then told Roby that if he did not follow her directive, he would be physically removed from the room. (*Id.* ¶ 20.) Still Roby did nothing. (*Id.*) Based on Roby's refusal to comply, the defendant and Langley approached him and took hold of his arms using a "come-along hold" that the defendant had learned in his training. (*Id.* ¶ 22.) They lifted him out of bed and attempted to escort him to the day room, but when they had gone about halfway across the room, Roby began to struggle and fight. (*Id.*) Roby swung his elbow at the defendant, and the defendant restrained his arm. (*Id.*) Holding both of Roby's arms, the defendant and Langley placed him up against a wall, but he began kicking at their feet and legs. (*Id.* ¶ 23.) At that point the defendant and Langley took Roby to the floor, face-up, and placed him in a "three-man hold." (*Id.*) A three-man hold is a technique the defendant learned in his training in which

3

the patient is placed on his back, with two people each holding one of the patient's arms and a third person holding the patient's legs. (*Id.* ¶ 24.) A three-man hold renders a patient immobile without inflicting pain. (*Id.*) In this case, the defendant and Langley were each holding one of Roby's arms, and Walker was holding Roby's legs. (*Id.* ¶ 25.) While he was in this hold, Roby continued to struggle and resist. (*Id.*)

At this point, Nurse Severns, a registered nurse on the unit, arrived in Roby's room along with another nurse. (*Id.* ¶ 26.) Nurse Severns told the other nurse to go get an injection, and that nurse left the room. (*Id.*) Nurse Severns then told Roby, who was still continuing to resist, what he needed to do in order to be released from the hold. (*Id.* ¶ 27.) After she gave Roby these instructions, the attendants moved Roby back to his bed. (*Id.*) The other nurse returned with the injection, which was administered to Roby. (*Id.* ¶ 28.) Roby then became calm. (*Id.*) At that point, the attendants released Roby from their hold. (*Id.*) The defendant had no further physical contact with Roby. (*Id.* ¶ 29.)

Based on his training, the defendant believed that physical intervention was necessary when Roby disobeyed two staff directives in his presence, refusing to get out of bed or leave his room in accordance with security protocols. (*Id.* ¶ 30) He believed the defendant to be a danger to staff and other patients. (*Id.* ¶ 33.) During this incident, the defendant used the techniques he learned in his training, and did not apply more force than was necessary to ensure Roby's compliance. (*Id.* ¶ 30.) At no time did the defendant strike or kick Roby, nor did he see any other staff member doing so. (*Id.* ¶ 32.) If Roby felt discomfort as a result of his physical contact with the defendant, it was due to his own resistance. (*Id.* ¶ 35.)

Summary judgment is appropriate when "the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the moving party is

entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986.) "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). Nevertheless, summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain."[2] *Lewis v. Downey*, 581 F.3d 467, 473 (7th Cir. 2009). However, "[j]ails are dangerous places, and it is without rational dispute that security officials are justified in maintaining decorum and discipline among inmates to minimize risks to themselves and other prisoners." *Id.* The "core judicial inquiry" with respect to a claim of excessive force by a correctional officer is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm" *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Factors to consider include "the need for an application of force, the relationship between that need and the force applied, the threat reasonably perceived by the responsible officers, the efforts made to temper the severity of the force employed, and the extent of the injury suffered by the prisoner." *DeWalt v. Carter*, 224

---

[2] It appears from the record that Roby was a pretrial detainee at the time of this incident, in which case the Fourteenth rather than the Eighth Amendment would apply; this distinction is of little significance, however, because in cases of excessive force "anything that would violate the Eighth Amendment would also violate the Fourteenth Amendment." *Lewis v. Downey*, 581F.3d 467, 475 (7th Cir. 2009).

F.3d 607, 619 (7th Cir. 2000). In order to survive a motion for summary judgment, "the prisoner must have evidence that will support a reliable inference of wantonness in the infliction of pain." *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004) (internal citation omitted).

Here, the undisputed facts show Roby failed to comply with multiple direct orders; the defendant reasonably concluded that Roby's behavior posed a threat to the security of the facility. As the Seventh Circuit Court of Appeals has observed:

> Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them . . . . When an inmate refuses to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.

*Lewis*, 581 F.3d at 476 (internal citation omitted). When an inmate "cannot be persuaded" to obey a direct order, "some means must be used to compel compliance, such as a chemical agent or physical force." *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984). That is what the defendant did here. The defendant and another attendant attempted to force Roby to comply with the orders by physically escorting him to the day room, but he resisted and attempted to strike and kick them. They then placed him in a hold that immobilized him without inflicting pain. The undisputed facts show that if Roby felt any discomfort during this incident, it was because he was actively resisting. After Roby was no longer resisting, hospital staff ceased their use of force.

On the basis of this record, the court concludes that the defendant's use of force was applied in a good-faith effort to maintain or restore order and not maliciously to cause harm. The amount of force used was appropriate in relation to the need for force precipitated by Roby's refusal to comply with multiple direct orders and his active resistance to the attendants' efforts to subdue him. *See Fillmore v. Page,* 358 F.3d 496, 503 (7th Cir. 2004) (no Eighth Amendment

violation where inmate suffered at most some discomfort and sore wrists as a result of legitimate use of force by defendant); *Lunsford v. Bennett*, 17 F.3d 1574, 1582 (7th Cir. 1994) (prison guards who used force to subdue and shackle a prisoner who resisted them did not violate the Eighth Amendment, even though prisoner was injured in the scuffle). Accordingly, the defendant is entitled to summary judgment.

For these reasons, the court **GRANTS** the defendant's motion for summary judgment (DE 60) and **ENTERS** judgment in favor of the defendant.

**SO ORDERED** on August 17, 2010.

    s/ Joseph S. Van Bokkelen
Joseph S. Van Bokkelen
United States District Judge
Hammond Division